**UNITED STATES**

**v.**

**Jason N. BARLOW, Lance Corporal (E–3), U.S. Marine Corps.**

**NMCM 9901699.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 9 July 1998.

Decided 31 March 2003.

LT Travis J. Owens, JAGC, USNR, Appellate Defense Counsel.

LCDR Jean M. Kilker, JAGC, USNR, Appellate Government Counsel.

LT Clarice B. Julka, JAGC, USNR, Appellate Government Counsel.

Before PRICE, Senior Judge, BRYANT, and HARRIS, Appellate Military Judges.

BRYANT, Judge:

A general court-martial composed of officer members convicted the appellant, contrary to his pleas, of wrongful distribution of lysergic acid diethylamide (LSD) and methamphetamine, wrongful possession of LSD, and wrongful use of methamphetamine, in violation of Article 112a, Uniform Code of Military Justice, 10 U.S.C. § 912a. The appellant was sentenced to 4 years confinement, forfeiture of all pay and allowances, reduction to pay grade E–1, and a dishonorable discharge. As an act of clemency, the convening authority mitigated the dishonorable discharge to a bad-conduct discharge, suspended all confinement in excess of 24 months for a period of 12 months from the date of his action, and approved the remainder of the sentence as adjudged.

In his sole assignment of error, the appellant asserts that the evidence presented was insufficient to support the findings of guilty. The thrust of the appellant's argument is twofold. First, the two primary Government witnesses (Privates Goldsmith and Sherlin) [1] are liars. Their testimony is, therefore, unworthy of belief and fails to prove beyond a reasonable doubt that the appellant violated Article 112a, UCMJ, 10 U.S.C. § 912a, in any way. Appellant's Brief of 19 Dec 2001 at 5. Second, citing *United States v. Williams,* 52 M.J. 218 (2000), the appellant argues that he "cannot be convicted on the uncorroborated testimony of a purported accomplice if that testimony is self-contradictory, uncertain, or

---

1.  Private Sherlin is variously referenced throughout the record as being a Lance Corporal. Additionally, the record contains variations in the spelling of his name. In this discussion, we will identify him as "Private Sherlin" unless quoting directly from the record.

improbable." Appellant's Brief of 19 Dec 2001 at 5. As argued by the appellant, inasmuch as Private Sherlin's testimony is "uncertain," it must be corroborated. *Id.* at 5–6. Further, the corroboration presented by the Government, that is, the testimony of Private Goldsmith, should be totally disregarded because the "law cannot allow the use of blatant lies to corroborate uncertain testimony." *Id.* at 6. As such, argues the appellant, the Government's evidence is legally and factually insufficient. *Id.* at 7.

After carefully considering the record of trial, the appellant's assignment of error, and the Government's response, we conclude that the findings and the sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

### Facts

The appellant's convictions arise from a series of events that transpired between March and October of 1997. The appellant was at the center of a group of Marines who regularly purchased and consumed controlled substances in conjunction with their attending a series of "after hours," or what are sometimes referred to as "rave," parties.

Turning first to events transpiring at the appellant's Marine Corps Air Station, Cherry Point barracks room, Private Goldsmith testified that sometime in the spring of 1997, he visited the appellant at the appellant's room. Record at 136. Over the proceeding year, Private Goldsmith said that he and the appellant had become friendly, and the former's appearance at the appellant's room was not unusual. Private Goldsmith testified that he gave the appellant $50.00 in exchange for a sheet of white LSD-laden blotter paper. According to Private Goldsmith, Lance Corporal LeMay, the appellant's roommate, was not present when the appellant produced the drugs from the battery compartment of a decorative orange railroad lantern. Private Goldsmith said that he subsequently used the substance provided to him by the appellant and experienced the physical effects consistent with the use of LSD. *Id.* at 138.

Private Goldsmith also testified that there was a party, dubbed "Vision," on approximately 27 March 1997, which he did not attend but which the appellant did. *Id.* at 148. Upon the appellant's return from that party, Private Goldsmith testified that he purchased three hits of LSD from the appellant at the appellant's room. The appellant obtained the LSD from inside some sort of CD or jewel box case. Private Goldsmith subsequently ingested the LSD and it made him feel "[r]eally, really high." *Id.* at 150.

Private Sherlin testified that in July 1997 he too visited the appellant's room. Also present at that time were "Goldsmith, McCoy, and Barlow." *Id.* at 252. Private Sherlin said he purchased about a half gram of methamphetamine from the appellant. Later the same evening, in the appellant's room, Private Sherlin said he "[s]norted" the methamphetamine he had previously purchased from the appellant. *Id.* at 253. Private Sherlin said the substance made him feel a "little speedy." *Id.* at 254. Furthermore, Private Sherlin said that while he was using methamphetamine, the appellant was also "snorting" one or two hits of methamphetamine. *Id.* at 263. Private Sherlin also said that a few weeks later, prior to attending a rave party, he purchased LSD from the appellant in the appellant's room. Private Sherlin said he used the purchased LSD at the rave and it made him feel similar to how he felt when he had used LSD on earlier occasions. *Id.* at 254–55.

Countering the accusations of drug sales and drug usage in the appellant's room, the appellant's roommate, Lance Corporal LeMay, testified that he never saw the appellant handle, sell, or use illegal drugs. He denied ever seeing an orange railroad lantern described by Private Goldsmith as the location in the appellant's room where the appellant allegedly secreted LSD. *Id.* at 316. Lance Corporal LeMay acknowledged, however, that he was working as many as 80 to 90 hours per week during the relevant time period, and that he and the appellant were working opposite shifts. A search of the room, conducted several months after the alleged purchase of LSD by Special Agents of the Naval Criminal Investigative Service

(NCIS), uncovered neither illegal drugs nor the orange railroad lantern.[2]

Addressing events surrounding a series of parties attended by this group of Marines, Private Goldsmith testified that in March 1997, he, the appellant, Private Sherlin, Lance Corporals Marcum, McCoy, and Mast, and one civilian, attended a party in Raleigh, North Carolina, dubbed "Electric Blue." *Id.* at 145. Private Goldsmith said "[w]e all chipped in" and provided cash to the appellant so the appellant could purchase LSD for them. *Id.* at 146. Thereafter, "either Lance Corporal Sherlin [sic] or Lance Corporal McCoy" actually gave him, Private Goldsmith, the purchased LSD. *Id.* Private Sherlin, in his testimony, confirmed his attendance at the party in Raleigh. He said that also in attendance were, "I believe … Goldsmith, McCoy and Barlow." *Id.* at 255. Private Sherlin said he gave the appellant cash and "[h]e [the appellant] went and found it, I guess, and came back, found us, and gave it to me." *Id.* at 256. Both Privates Goldsmith and Sherlin said that they thereafter ingested the purported LSD and felt the physical effects they believed confirmed they had ingested LSD.

On or about 31 March 1997, Private Goldsmith, the appellant, and one other individual attended the "Infectious Grooves" party in Durham, North Carolina. While traveling to the party in the same vehicle, Private Goldsmith said that he witnessed the appellant "snorting" a "yellow powder" through a straw. *Id.* at 139. After arriving at the party, Private Goldsmith gave the appellant $50.00 in exchange for several doses of LSD. Private Goldsmith immediately consumed three doses, returning the remainder to the appellant who placed the drugs in his pocket. Although Private Goldsmith said he was high from a pill he had previously taken, the "added" effect from taking the LSD was what he expected from taking LSD. He added, "I took the stuff that I had off the same ten strip later and got the same effect." *Id.* at 143.

The activities of this group of partygoers continued throughout the summer and into the early fall of 1997. Private Goldsmith testified that on or about 4 July 1997, he, the appellant, Private Sherlin, and Lance Corporals McCoy, Parracanales,[3] and Gray, attended a party in Atlanta, Georgia. At the party the appellant identified an individual from whom Private Goldsmith could purchase LSD. *Id.* at 144. Private Sherlin testified and confirmed that he and the others identified by Private Goldsmith attended the party.[4] In contrast to Private Goldsmith's experience, however, Private Sherlin testified that he provided the appellant with cash, which the appellant used to purchase LSD for Private Sherlin. As with the other occasions, Private Sherlin said he got "high" after using the LSD supplied by the appellant. *Id.* at 257.

In the fall of 1997, the appellant, along with Privates Goldsmith and Sherlin, attended a party billed as "First Friday" in Greensboro, North Carolina. *Id.* at 151. At the conclusion of that party, the three Marines went to a smaller, private party. At this gathering Private Goldsmith said he saw the appellant and Private Sherlin "snorting a yellow powder substance off a mirror." *Id.* at 152. Private Sherlin, during his testimony, confirmed his and the appellant's attendance at the smaller party. He also confirmed that he and the appellant snorted a quantity of methamphetamine over the course of several hours. This larger supply of the drug was provided to the party attendees by the appellant, who purchased the

---

**2.** The search did uncover, however, a business card belonging to the Special Agent in charge of the investigation. Oddly enough, the day before the search was conducted, the Special Agent in question had given a business card to an associate of the appellant who was questioned regarding the appellant's suspected illegal activities.

**3.** Lance Corporal Parracanales testified and confirmed her attendance at the party. Although unsure, she did recall a slightly different group in attendance. She did confirm, however, the at-

tendance of the appellant and Privates Goldsmith and Sherlin at the party.

**4.** Private Sherlin identified the same attendees at the party, by name, as did Private Goldsmith with one exception. Private Sherlin did not specifically mention Lance Corporal Gray. He did, however, say that "[t]here was someone else there. I don't remember who it was though, sir." *Id.* at 256.

substance with funds he collected from Private Sherlin and others. Private Sherlin said his "high" "lasted throughout the day." *Id.* at 261.

### Sufficiency of the Evidence

The appellant has couched both his legal and factual sufficiency arguments in terms of whether the accomplice testimony presented to the members was adequate to support his convictions.

By statute, we are charged with determining both the legal and factual sufficiency of the evidence presented at trial. Art. 66(c), UCMJ; *United States v. Turner,* 25 M.J. 324 (C.M.A.1987). The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *Turner,* 25 M.J. at 324 (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). In contrast, the factual sufficiency test is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the [reviewing court] are themselves convinced of the accused's guilt beyond a reasonable doubt." *Id.* at 325. In making these determinations, we are mindful that reasonable doubt does not mean the evidence must be free of conflict. *United States v. Reed,* 51 M.J. 559, 562 (N.M.Ct.Crim.App.1999), *aff'd,* 54 M.J. 37 (2000). Furthermore, as " 'factfinders [this Court] may believe one part of a witness' testimony and disbelieve another.' " *United States v. Lepresti,* 52 M.J. 644, 648 (N.M.Ct.Crim.App.1999)(quoting *United States v. Harris,* 8 M.J. 52, 59 (C.M.A.1979)).

To convict the appellant of the various offenses listed on the Charge Sheet, the Government had to prove that, depending upon the specification in question, the appellant: (1) either possessed, used, or distributed a controlled substance; and (2) that his possession, use, or distribution was wrongful. MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.), Part IV, ¶ 37(b)(1)-(3). As correctly noted by the appellant, the prosecution's case was short on physical evidence and long on accomplice testimony. As persons criminally involved in the offenses with which the appellant was charged, the Government's primary witnesses, Privates Goldsmith and Sherlin, certainly fall within the definition of accomplices. *See United States v. Davis,* 32 M.J. 166, 168 (C.M.A.1991). Consequently, our task is determine whether their testimony alone was sufficient to convict the appellant.

Prior to the 1984 revision of the Manual for Courts–Martial [hereinafter Manual], "a conviction cannot be based upon uncorroborated testimony given by an accomplice in a trial for any offense if the testimony is self-contradictory, uncertain, or improbable." MANUAL FOR COURTS–MARTIAL, UNITED STATES, 1969 (Revised ed.), ¶ 74a(2). While this passage was eliminated from the main body of the Manual after 1984, similar wording appeared in subsequent editions of the Manual, specifically, in the Discussion to RULE FOR COURTS–MARTIAL 918(c), MANUAL FOR COURTS–MARTIAL, UNITED STATES (1998 ed.):

> Findings of guilty may not be based solely on the testimony of a witness other than the accused which is self-contradictory, unless the contradiction is adequately explained by the witness. Even if apparently credible and corroborated, the testimony of an accomplice should be considered with great caution.

Our fellow service courts have generally concluded that the pre–1984 requirement for corroboration of accomplice testimony, when such testimony is "self-contradictory, uncertain, or improbable[,]" was captured in the discussion portion of R.C.M. 918(c). *United States v. Thompson,* 26 M.J. 512, 515 (A.C.M.R.1988); *see United States v. Sanders,* 34 M.J. 1086, 1092 (A.F.C.M.R.1992). More recently in *Williams,* 52 M.J. at 221–22, our superior Court indicated that the corroboration requirement for self-contradictory accomplice testimony is no longer necessary because of the 1984 Manual change. Unfortunately, this conclusion as to the current status of the law may be subject to some limited debate given certain language used in the Court's analysis, *i.e.,* "[m]oreover, even if this [former] evidentiary insufficiency rule is still good law ... it was not violated in this

case." *Id.* at 222; *see also United States v. Bigelow,* 57 M.J. 64, 67–68 (2002).

■ We need not address the appellant's contention that the law requiring corroboration of the testimony of an accomplice whose testimony is self-contradictory, uncertain, or improbable is now the same as it was before the Manual change in 1984. *See United States v. Jiles,* 51 M.J. 583, 588 (N.M.Ct. Crim.App.1999). We need not so decide for two reasons. First, in his instructions on findings, without objection, the military judge gave the standard accomplice testimony instruction, as appropriately modified for this case, found in the Military Judges' Benchbook, Dept. of the Army Pamphlet 27–9 at 825–26 (30 Sep 1996).[5] Specifically, the military judge instructed the members, among other things, that:

> Additionally, the accused cannot be convicted on the uncorroborated testimony of a purported accomplice if that testimony is self-contradictory, uncertain, or improbable. In deciding whether the testimony of Lance Corporal Parracanales, Private Goldsmith, and Private Sherlin is self-contradictory, uncertain, or improbable, you must consider it in the light of all the instructions concerning the factors bearing on a witness's credibility.

Record at 364. The members were, therefore, instructed based upon the law as it clearly existed prior to the Manual change of 1984 and as the appellant argues the law was thereafter.[6] Members are presumed to follow the instructions of the military judge. *United States v. Ellis,* 57 M.J. 375, 382 (2002). So, even with the law framed as the appellant now argues the law existed at the

time of his trial, the members, nevertheless, convicted him.

■ Second, again assuming the law is as the appellant contends, we, like our superior Court in *Williams,* find that the rule "was not violated in this case." *Williams,* 52 M.J. at 222. We find that the testimony of Private Goldsmith, except for one statement discussed in more detail below, and Private Sherlin are not self-contradictory, uncertain, or improbable. Privates' Goldsmith and Sherlin both provided certain and clear testimony concerning the appellant's repeated possession, use, and distribution of various controlled substances. Their respective accounts of the appellant's conduct between March and October of 1997 sufficiently coincided with one another, and neither witness provided what could be characterized as improbable testimony. Furthermore, their testimony, and that of Lance Corporal Parracanales, provides any necessary corroboration.

Additionally, referencing the clear wording of the discussion portion of R.C.M. 918, the testimony of neither witness was "self-contradictory" in any significant respect. Neither Private Goldsmith nor Private Sherlin wavered concerning the crucial facts of the appellant's criminal activities. The appellant's focus on their motives to lie, based upon their respective pretrial agreements, which required both of them to testify against the appellant, and the appellant's focus on Private Goldsmith's possible contact with extraterrestrial life, are general credibility matters—not incidents of "self-contradictory" testimony as contemplated by R.C.M. 918.[7] *See Lepresti,* 52 M.J. at 648; *Reed,* 51 M.J. at 562.

*See, e.g., United States v. Manner,* 887 F.2d 317, 323 n. 4 (D.C.Cir.1989); *Takacs v. Engle,* 768 F.2d 122, 127 (6th Cir.1985); *Jacobs v. Redman,* 616 F.2d 1251, 1255 (3d Cir.1980); *United States v. De Larosa,* 450 F.2d 1057, 1060 (3d Cir.1971).

---

**5.** See the Appendix for the standard Benchbook instruction.

**6.** *See Bigelow,* 57 M.J. at 67, where our superior Court reasoned that:

> While finding "the better practice [is] for courts to caution juries against too much reliance upon the testimony of accomplices," the Supreme Court recognized "there is no absolute rule of law preventing convictions on the testimony of accomplices," even though there is no cautionary instruction, and did not reverse the trial judge for failure to give such a cautionary instruction. *Caminetti v. United States,* 242 U.S. 470, 495, 37 S.Ct. 192, 61 L.Ed. 442 (1917).

**7.** A facet of the cross-examination of Private Goldsmith focused on statements he made prior to the appellant's trial wherein Private Goldsmith indicated he had been contacted by aliens, *i.e.,* extraterrestrials. *Id.* at 162–63. Private Goldsmith's response to the inquiry was, generally, vague, and to say that he "might have just been joking" and "I don't remember." *Id.*

"[N]either grant of immunity nor testimonial inconsistencies stamp an accomplice's testimony as unbelievable as a matter of law." *Williams*, 52 M.J. at 222. Similarly, a witness who testifies pursuant to the terms of a pretrial agreement is not automatically unworthy of belief. Even in those cases where the testimony of an accomplice is procured through a pretrial agreement, that fact alone does not make the witness' testimony "self-contradictory." The same can be said of any witness who happens to believe he was contacted by space aliens, elves, or any number of supernatural beings. As an accomplice, the witness' odd beliefs may affect his credibility in a general sense. It may even, in extreme situations, call into question the competency of the witness to testify. *See* MIL. R. EVID. 601, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.). However, such beliefs do not render his testimony "self-contradictory" within the meaning of R.C.M. 918.

Instead of identifying self-contradictory statements made by the accomplices, the appellant relies upon what he sees as contradictions between the respective testimonies of Privates Goldsmith and Sherlin. For example, the appellant places considerable faith in the fact that Private Goldsmith testified that Private Sherlin sold him illegal drugs, and that Goldsmith denied selling drugs to Sherlin. Later in the court-martial, Private Sherlin testified that Private Goldsmith sold him drugs, yet he denied selling drugs to Goldsmith. Appellant's Brief of 19 Dec 2001 at 4–5.

Under a literal reading of the discussion portion of R.C.M. 918, the contradictions between the two separate accomplice accounts need not be explained to support a conviction. The passage in question only requires that an accomplice adequately explain his own "self-contradicting" testimony.

As noted previously, we do see one internally self-contradicting statement made by Private Goldsmith that would, pursuant to R.C.M. 918, require adequate explanation. Private Goldsmith denied selling drugs except on the one occasion he was snared by the NCIS as he attempted to sell a controlled substance to a law-enforcement officer. Rec-

ord at 215, 217–18. Private Goldsmith then admitted he had sold a substance that he believed to be methamphetamine while attending a rave with the appellant. *Id.* at 215. This amounts to self-contradictory testimony. Private Goldsmith attempted to explain his actions by testifying that the substance he sold at the rave was fake, and that his attempted sale to the NCIS agent was his first attempt to sell controlled substances. *Id.*

Admittedly, Private Goldsmith's explanations are not completely above reproach. Nevertheless, his testimony about the appellant's drug activity was, as noted previously, corroborated by the testimony of Private Sherlin, and vice-versa. While their testimony was not 100% consistent, it was sufficiently consistent to provide corroboration of the other. Further, the testimony of Lance Corporal Parracanales provides some degree of corroboration as to one aspect of the testimony of Privates Goldsmith and Sherlin.

We conclude that the record contains more than sufficient evidence, in the form of accomplice testimony, upon which reasonable members could have found all the elements of the charged offenses. Additionally, after weighing the accomplice testimony outlined above, and making the necessary allowances for not having observed the witnesses' demeanor at trial, we are personally convinced of the appellant's guilt beyond a reasonable doubt.

Finally, going beyond the confines of the appellant's accomplice testimony arguments, and considering generally all contradictions and inconsequential gaps in the evidence he has identified in light of the Article 66(c), UCMJ, standard, we remain convinced that the evidence presented at trial was both legally and factually sufficient to convict him.

Accordingly, we affirm the findings and sentence, as approved on review below.

Senior Judge PRICE and Judge HARRIS concur.

## APPENDIX

The "Accomplice Testimony" instruction in the Military Judges' Benchbook, Dept. of the

Army Pamphlet 27–9 at 825–26 (30 Sep 1996) provides:

> You are advised that a witness is an accomplice if he/she was criminally involved in an offense with which the accused is charged. The purpose of this advice is to call to your attention a factor specifically affecting the witness' believability, that is, a motive to falsify (his)(her) testimony in whole or in part, because of an obvious self-interest under the circumstances.
>
> (For example, an accomplice may be motivated to falsify testimony in whole or in part because of his/her own self-interest in receiving (immunity from prosecution) (leniency in a forthcoming prosecution) (_____).)
>
> The testimony of an accomplice, even though it may be ((apparently) (corroborated) and) apparently credible is of questionable integrity and should be considered by you with great caution.
>
> In deciding the believability of (state the name of the witness), you should consider all the relevant evidence (including but not limited to (here the military judge may specify significant evidentiary factors bearing on the issue and indicate the respective contentions of counsel for both sides)).
>
> Whether (state the name of the witness), who testified as a witness in this case, was an accomplice is a question for you to decide. If (state the name of the witness) shared the criminal intent or purpose of the accused, if any, or aided, encouraged, or in any other way criminally associated or involved himself/herself with the offense with which the accused is charged, he/she would be an accomplice whose testimony must be considered with great caution.
>
> (Additionally, the accused cannot be convicted on the uncorroborated testimony of a purported accomplice if that testimony is self-contradictory, uncertain, or improbable.)
>
> (In deciding whether the testimony of (state the name of the witness) is self-contradictory, uncertain, or improbable, you must consider it in the light of all the instructions concerning the factors bearing on a witness' credibility.)
>
> In deciding whether or not the testimony of (state the name of the witness) has been corroborated, you must examine all the evidence in this case and determine if there is independent evidence which tends to support the testimony of this witness. If there is such independent evidence, then the testimony of this witness is corroborated; if not, then there is no corroboration.